UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
───────────────────────────────

In re:
    Thomas F. Turturo,                                    Case No. 13-30077
                                            Chapter 7
                       Debtor.

───────────────────────────────

Thomas F. Turturo,
                   Plaintiff,                      Adv. Proc. No. 13-50005
    v.

Access Group, Inc., *et al.*,
                   Defendants.

───────────────────────────────

Appearances:                                          On behalf of:

Thomas F. Turturo, Esq.                               Plaintiff Pro Se
228 Genesee Street
Auburn, New York 13021

Michael D. Gadarian, Esq.                             Access Group, Inc.
Bousquet Holstein PLLC
One Lincoln Center, Suite 900
Syracuse, New York 13202

William F. Larkin, Assistant U.S. Attorney            U.S. Department of Education
P.O. Box 7198
100 S. Clinton St.
Syracuse, NY 13261-7198


## **MEMORANDUM-DECISION AND ORDER**

      Thomas F. Turturo (variously "Plaintiff," "Debtor," "Attorney Turturo") brought this adversary proceeding seeking a declaration that student loans owed to the three defendants—Access Group, Inc. ("Access"), Citigroup Student Loan Corporation and U.S. Department of Education ("U.S. Dept. Educ.")—should be found dischargeable as imposing an undue hardship upon the Debtor pursuant to 11 U.S.C. § 523(a)(8). Both Access and U.S. Dept. Educ. answered

the complaint, generally denying that Attorney Turturo meets the Second Circuit standard for finding undue hardship to warrant discharge of his student loan obligations (Docs. 9 and 14). Although Citigroup Student Loan Corporation was served, it failed to answer or otherwise respond to the complaint. The Clerk entered default, Plaintiff moved for entry of a default judgment, and the claim against Citigroup Student Loan Corporation has been addressed by separate order and judgment. This memorandum-decision and order, which incorporates the court's findings of fact and conclusions of law as permitted by Fed. R. Bank. P. 7052, solely addresses the Debtor's obligations to Access and U.S. Dept. Educ. For the reasons that follow, the court finds the Debtor's obligations non-dischargeable and shall dismiss the complaint as to both Access and U.S. Dept. Educ.

*Jurisdiction*

As recognized by the parties, this court has jurisdiction to hear and enter a final judgment in this adversary proceeding pursuant to the provisions of 28 U.S.C. § 1334(b) and § 157 (b)(2)(I).

*Background Facts*

The following facts are gleaned from the entire record of these proceedings including: (i) the oral testimony of Mr. Turturo, who was the only witness to testify at trial; (ii) a Joint Stipulation of Facts submitted by the Debtor and U.S. Dept. Educ. (Doc. 62) ("Joint Stipulation"); (iii) a separate Trial Stipulation between the Debtor and Access; and (iv) Exhibits A through K, which were introduced into evidence by U.S. Dept. Educ.[1]

Plaintiff is a thirty-one year-old male who has no dependents and no health impairment that would restrict his ability to work. He attended high school locally and went away to college

---

[1] Exhibit E, consisting of the voluntary petition and schedules completed by Mr. Turturo and filed with this court on January 23, 2013, which commenced this chapter 7 bankruptcy filing, was offered jointly by the Debtor and U.S. Dept. Educ.

2

for four years to Dickinson College in Carlisle, Pennsylvania, which conferred upon him a Bachelor of Arts degree in 2005. Upon graduation from college, Mr. Turturo testified that he had approximately twelve to eighteen thousand dollars in student loan debt.

In the Fall of 2005, Debtor enrolled as a full-time student at DePaul University College of Law, a private law school located in Chicago, Illinois. In order to pay for his law school education and living expenses, the Debtor took out additional student loans. Debtor testified that he focused his interest and course work on international transactional law. In anticipation of receiving his Juris Doctor degree and passing the Illinois bar in 2008, Debtor looked for a job in the Chicago area in asset-based derivatives but did not secure employment. He received his law degree and passed the Illinois bar but did not and most likely could not have foreseen the implosion of the financial markets in 2008 and the concomitant drying up of the legal market. It was widely reported that an estimated one out of every three law graduates that year failed to secure any work and, of those who did, many held jobs that did not require a law degree. The Debtor remained in the Chicago area until January, 2009—when, not having landed a job—he returned to central New York to live with his father in Marcy, while he studied for the New York Bar exam.

*Work History*

To gain legal experience, the Debtor accepted an unpaid internship in the summer of 2009 with a small firm in Auburn, New York, which involved a significant commute from Marcy, New York three times a week. The work focused on representing debtors in bankruptcy. The Debtor worked as an unpaid intern for two months, then started to receive a small stipend. He relocated to Auburn, New York and continued to work at the firm part-time. In 2010, Debtor passed the New York Bar, was admitted to practice, and remained at the firm doing part-time

work as an attorney. Ownership of the law firm changed in July, 2010. Debtor worked for the firm until November 3, 2010 when his employment terminated.

In testifying about his next career move, the Debtor quoted a law professor of his who purportedly advised students, "[t]here's no such thing as an unemployed attorney. You can always hang up a shingle."[2] In November, 2010, Mr. Turturo proceeded to hang up a shingle as a sole practitioner in Auburn, New York, representing debtors in consumer bankruptcy cases, which he continues to do to this day. Besides bankruptcy, the only other types of cases which Mr. Turturo handles are criminal defense of misdemeanor charges, primarily as assigned counsel in Cayuga County. Mr. Turturo testified that the pay scale for this latter category is very low, with payment delayed for as long as six months after a representation is concluded. He further testified that he doesn't feel comfortable taking on a felony case.

Mr. Turturo stated that he follows job openings on various job boards and has applied for jobs "even …outside the bankruptcy realm" in both the Northern District of New York and in Chicago, but that his efforts to obtain other employment have been unsuccessful.

*Debtor's Student Loan Obligations*

At filing, Debtor's schedules reflect total liabilities of $444,000, of which almost $300,000 represent his student loan obligations. Debtor has two separate loans with Access, which were in forbearance until October, 2010, when Debtor began making payments. The loans ultimately went into default on or about November 15, 2011, with a combined balance at that time of $39,741.13. There is no evidence of any further effort by Attorney Turturo to make any payments to Access. There was unrefuted testimony that, prior to trial, Access offered the

---

[2] In this court's opinion, that is probably the worst advice a law professor can give a third year law student. With little to no practical experience and without the support of senior mentors to provide needed legal and practical guidance on client confidential matters, it is the rare individual who can effectively represent clients and simultaneously successfully manage a start-up business at this early stage of a legal career.

4

Debtor two repayment options—with Debtor paying either $350 or $450 per month and Access discounting the loan balance by 10% and offering 0% interest—to which Mr. Turturo did not respond.

Debtor had multiple loans with U.S. Dept. Educ. and in October, 2010, Debtor applied to consolidate these loans under the Federal Direct Consolidation Loan program. The loans were consolidated and refinanced at 6.25% interest, evidenced by two promissory notes executed by the Debtor on December 30, 2010, in the respective amounts of $154,977.95 and $51,245.16. In January, 2011, Debtor applied for the Income Based Repayment Program ("IBRP" or "Program"). Under this Program, a debtor's payments are determined by one's income and what he can afford to pay. That calculation is made based upon the Debtor's initial certification of his income and his verification of income every year thereafter by annually submitting one's tax return. Debtor's initial application included his (i) 2009 tax return, accompanied by his W-2 form, and (ii) August 12 and September 2, 2010 pay stubs from his employer law firm which included summary year-to-date figures, to reflect his 2009 income ($7,458) and 2010 income ($12,597).[3] Debtor indicated that he had been laid off from the firm in the fall of 2010 and had no additional income for that year. He further represented: "My intention is to become self-employed in 2011 and I am taking steps for this at the present time." (Exhibit C, page 3).[4] Debtor was accepted into the IBRP. However, when the next annual period to recertify one's income arrived, Attorney Turturo failed to submit his 2010 federal income tax return and, as a result, his participation in the Program was terminated. At trial, Attorney Turturo's proffered

---

[3] The 2010 income is derived from the year-to-date net pay figure reflected on the 9/02/2010 pay stub. However, Debtor's termination from the law firm was 11/3/2010, which would have covered two more pay periods. Although not confirmed on the record, the court surmises that Debtor's 2010 income from the law firm may have been closer to $13,827.15, calculated as follows: $12,597.11 + (2 x $615.02), reflecting two more net pay amounts of $615.02 per pay period.

[4] Attorney Turturo testified, however, that he had been self-employed as of November 3, 2010.

5

explanation as to why he did not timely submit his 2010 return to remain qualified for the IBRP was that he could not afford to hire an accountant to prepare it. Following termination from the Program, Debtor did not apply to the U.S. Dep't Educ. for any alternative repayment program. At trial, U.S. Dep't Educ. introduced evidence of the various programs that are available, although, since Mr. Turturo has not applied, it is not certain whether (i) he would qualify for any specific program, nor (ii) what his monthly repayment amount would be. Attorney Turturo made total payments of $2,269.11 on his student loan obligations to U.S. Dep't. Educ. As of June 28, 2013, the Debtor owed U.S. Dep't. Educ. $236,376.79.

Evidence was adduced at trial that around the time that Debtor was consolidating his U.S. Dep't Educ. loans and was being accepted into the IBRP, he had a flurry of activity with respect to his newly-formed solo practice. In December, 2010, he secured a new client who provided a sizeable retainer and, according to Attorney Turturo, he had a "big pile of cash in hand." Attorney Turturo negotiated a car purchase of a 2010 Acura ZDX for himself at a cost of approximately $50,000, requiring monthly payments of $940.00. Simultaneously, Turturo was negotiating to purchase a property at 2 South Street in Auburn, NY. The purchase closed on February 28, 2011 for $352,000, for which Turturo borrowed $20,000 to make a cash down payment and assumed a mortgage of $332,000.[5]

During cross-examination, U.S. Dep't. Educ. was relentless in pressing Attorney Turturo to explain how he found the money for the foregoing expenditures but somehow couldn't come up with $450 to retain an accountant to prepare his 2010 tax return so that he could remain eligible for the IBRP. Attorney Turturo responded that "[that] was a low priority in 2011."

---

[5] For some inexplicable reason, the mortgage was never legally assigned to Turturo and legal title to the property never vested in Turturo. Nevertheless, Turturo's 2011 tax return reflects that he made interest payments on the mortgage of $16,800 and utility payments of $17,038 and the property sold to a third party in December, 2011 for $330,000.

6

*Debtor's Income and Expenses*

In setting out as a solo practitioner with his own law office, Mr. Turturo was ill-prepared, having never run a business before. He readily admits that he did not budget well nor did he appreciate how quickly expenses mount. Furthermore, over the course of discovery and the issues raised before this court, it has become readily apparent that Mr. Turturo's bookkeeping regarding his business income and expenses is primitive—more akin to an unsophisticated consumer than a businessman—and that his records are woefully inadequate.

The Debtor described his income as "fluctuating" and that there is a "net wash after expenses are paid." Debtor's IRS Form 1040 for tax year 2009, when Debtor was employed at the Auburn law firm, reflects total income from wages of $7,548. For tax year 2011, Debtor's IRS Form 1040 reflects gross business income of $49,607 (net business income of -$2,675) and an adjusted gross income of $8,393. For tax year 2012, Debtor's 1040 IRS return reflects gross business income of $81,302 (net business income of $18,955) and an adjusted gross income of $14,616. If Attorney Turturo ever filed a 2010 tax return, it is not in evidence. Notwithstanding the commencement of this adversary proceeding on May 19, 2013, the Debtor did not file his federal income tax returns for tax years 2011 and 2012 until February 14, 2014.

The delinquency of the Debtor in timely filing his tax returns did not come to the court's attention until the issue was raised in a pre-trial conference in the course of discovery, prompting this court to enter an order on January 15, 2014 which directed the Debtor to file his 2011 and 2012 returns by January 31, 2014.[6] At the time of trial on July 10, 2014, the Debtor had not yet filed his tax returns for 2013 nor did he specifically testify nor otherwise establish what his gross income was for the prior year. Instead, he loosely referred to his schedules "I" and "J" filed with his petition on January 23, 2013 and testified that his income and expenses remain "more or less

---

[6] As it was, Attorney Turturo filed the returns two weeks beyond the court-ordered deadline.

7

consistent" with what is represented on those schedules.[7] Plaintiff has stipulated that his net monthly income from November of 2010 through November of 2013 was approximately $2,100 (¶ 15 of Joint Stipulation). Plaintiff resides with his girlfriend who has a current monthly income of $3,100 (¶ 22 of Joint Stipulation).

The parties stipulated that the Debtor's current monthly household expenses consist of the following:

| Expense | Amount |
|---|---|
| Electric and Gas | $500.00 |
| Water | 100.00 |
| Telephone (two cell phones) | 153.00 |
| Food (two people) | 600.00 |
| Clothing, laundry, dry cleaning | 125.00 |
| Medical expenses | 80.00 |
| Gasoline | 400.00 |
| Homeowner's insurance (includes business) | 150.00 |
| Property taxes | 900.00 |
| Girlfriend's credit cards | 500.00 |
| Subtotal of monthly expenses | $3,508.00 |

(¶ 23 of Joint Stipulation). In June, 2012, Debtor acquired the property located at 228 Genesee Street in Auburn, NY at which he currently resides and conducts his law practice. The Debtor purchased the property for $4,000 in cash and assumed the outstanding real property taxes. Other than the student loan obligations, the Debtor has no fixed installment obligations or other legally enforceable obligations. Debtor testified that he and his girlfriend live a moderate lifestyle and that there is little to no money left over after payment of expenses to make any meaningful repayment on his student loans. Debtor indicated that any such payments would not even keep up with interest accruing on the loans. Upon concluding his oral testimony, and in reliance on his sole documentary evidence consisting of his filed petition and schedules, Plaintiff rested.

---

[7] On cross-examination, the Debtor admitted that since the date of filing, his health insurance expense was reduced by $90 from $300 to $210 and that his auto installment payment was reduced by $95 from $250 to $155.

8

On cross-examination of the Debtor, there was considerable scrutiny of the expenditures of the Debtor preceding his filing for bankruptcy including those referenced above as well as his listed expenses on Schedule "J," with particular focus on the Debtor's purported $500 monthly expense paid on "Girlfriend's credit cards." According to the Debtor, he was an authorized user on his girlfriend's Capital One account and utilized this card for personal expenses because he did not have access to a credit card after filing for bankruptcy. The $500 expense represents Debtor's estimate of monthly payments he made to cover charges he incurred on the card.[8] The Debtor utilized two bank accounts to cover his expenses: one at Bank of America and the second at First Niagara, which were used to pay for both his law business and personal expenses. In discovery, the Debtor was asked to produce his monthly statements reflecting his transactions in these accounts. The documents produced were received in evidence as Exhibits "I" and "J." The statements from Debtor's First Niagara account reflect total withdrawals of $15,550 for payments made on the Capital One credit card account for the five month period of August through December, 2012.[9] This averages out to be more than six times the $500 monthly payment that the Debtor estimated he spent and demonstrates that the Debtor had a cash flow at the time that supported making those payments. Furthermore, Debtor made total payments of $39,058.31 on this Capital One account in 2013 (an average of $3,255 per month) and payments totaling $6,462.13 for the first three months of 2014 (an average of $2,154 per month).

Close scrutiny of the Debtor's expenses from the limited records that were provided also reflect expenditures on personal expenses that appear to be improvident and profligate, reflecting

---

[8] The Debtor further testified that charges on the card were for court fees. However, there was no corroborative evidence introduced to support what the charges entailed as neither the Capital One Statements nor any other documents were produced by the Debtor in support of his oral testimony.

[9] Although subject to an outstanding discovery request, Debtor failed to produce First Niagara statements for the first seven months of 2012 and offered no plausible explanation as to why they were missing.

9

a lifestyle that is not enjoyed by a typical debtor in this court. These categories of excess include dining out and bar tab expenses, online gaming expenses and singular, stand-out expenditures such as the March 14, 2011 expenditure of $183 which Debtor testified was for the purchase of a tie.

*History of and Legal Standard for Discharging Student Loan Debts*

Congress' recognition of student loan debt as a category of debt excepted from discharge was first introduced by passage of the Education Amendments of 1976. The legislation provided that student loan debt limited to federally insured loans could only be discharged upon a showing that either (i) five years had elapsed since the loan first became due; or (ii) failure to discharge a loan would cause an undue hardship for the debtor and her dependents.[10] This provision was subsequently incorporated into the Bankruptcy Reform Act of 1978, with the category of loans broadened to include educational loans owing to a governmental unit or nonprofit institution.[11] The five year period for holding a loan non-dischargeable was subsequently expanded to seven years in 1990.[12] And the provision of a time period from which the loan first became due after which the student loan was automatically discharged was entirely eliminated in 1998.[13] Thereafter, student loans were no longer automatically dischargeable. On the contrary, they are now presumptively non-dischargeable unless the Debtor can prove that repayment of the loan would impose an undue hardship.[14]

---

[10] Pub. L. No. 94-482, § 439A, 20 U.S.C. § 1087-3 (1976) (repealed 1978).
[11] Pub. L. No. 95-598, effective Oct. 1, 1979, codified at 11 U.S.C. § 523(a)(8).
[12] *See* Criminal Victims Protective Act of 1990, Pub. L. No. 101-581, effective Nov. 15, 1990. This Act also made the provision applicable in chapter 13 proceedings; previously it had only applied in chapter 7 proceedings.
[13] Higher Education Amendments of 1998, Pub. L. No. 105-244, 112 Stat. 1837 (1998).
[14] Pursuant to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 § 220, § 523(a)(8) was again modified and broadened to provide that a debt for a "qualified education loan" as defined in section 221(e)(1) of the Internal Revenue Code is non-dischargeable, unless excepting such debt from discharge would impose an undue hardship on the debtor and debtor's dependents.

10

In 1987, the Second Circuit issued its seminal decision in *Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987). The debtor, who sought to discharge her student loans as imposing an undue hardship, filed bankruptcy within a month of the date the first payment on her loans came due. In enunciating a standard for finding "undue hardship," the *Brunner* court found that a debtor must prove by a preponderance of the evidence the following three prongs:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;
> (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
> (3) that the debtor has made good faith efforts to repay the loans.

*Id.* at 396. The *Brunner* standard enunciated by the Second Circuit more than twenty-five years ago remains the law of this Circuit and has been adopted as the rule of law by a number of other circuits.[15]

Many have argued that the *Brunner* standard goes too far, that it is harsh and outdated when considered in the context of today's outstanding student loan obligations and support a change to the undue hardship standard to be applied to student loan debt.[16] Others point to the fact that eighteen years after the *Brunner* decision, in 2005, Congress added a definition of "undue hardship" in an unrelated Code section involving the review of reaffirmation agreements

---

[15] *See U.S. Dep't of Educ. v. Gerhardt (In re Gerhardt)*, 348 F. 3d 89, 91 (5th Cir. 2003); *Hemar Ins. Corp. of Am. v. Cox (In re Cox)*, 338 F.3d 1238, 1241 (11th Cir. 2003); *United Student Aid Funds, Inc. v. Pena, (In re Pena)*, 155 F.3d 1108, 1112 (9th Cir. 1998); *Pa. Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 306 (3d Cir. 1995).

[16] *See e.g., Krieger v. Educ. Mgmt. Corp.*, 713 F.3d 882, 884 (7th Cir. 2013) (warning against "judicial glosses" of the statutory language, such as found in *Brunner*, to override the language of the statute itself); *In re Myhre*, 503 B.R. 698, 702-03 (Bankr. W.D. Wis. 2013) (noting that when it was decided, *Brunner* "only applied to a small subsection of student loans" and the Code and the nature of student loan borrowing have dramatically changed since then); *In re Wolfe*, 501 B.R. 426, 434-35 (Bankr. M.D. Fla. 2013) ("There is merit to the argument that the rigors of the *Brunner* test are no longer appropriate to curb borrower abuse from a premature discharge amidst only temporary financial distress.").

that is far more lenient than the test enunciated in *Brunner*.[17] Nevertheless, the Second Circuit continues to follow Brunner, repeating the three-prong test as recently as 2011 in a summary order.[18] Accordingly, this court views *Brunner* as binding precedent and will apply its standard in assessing whether the Debtor meets the three-prong test for finding undue hardship.

*Discussion*

Debtor bears the burden of proving by a preponderance of the evidence that his student loan debts are dischargeable under § 523(a)(8). *See Grogan v. Garner*, 498 U.S. 279, 291 (1991) ("[T]he standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard."). All prongs of the three-prong undue hardship test must be met for the Debtor's educational loans to be discharged. *Brunner*, 831 F.2d at 396.

> *First Prong: Can the Debtor maintain, based on current income and expenses, a "minimal" standard of living if forced to repay the loans?*

The court finds the record before it totally lacking. Debtor has failed to clearly establish what his current financial condition is in order for the court to properly assess whether he could maintain a minimal standard of living if forced to repay the loans. No financial records were introduced into evidence by the Debtor to support his self-serving oral testimony and verify that the numbers he placed in his schedules almost two years ago accurately reflect his current financial condition. Due to the incompleteness of financial records, Debtor's current gross income cannot be ascertained. By the time of trial, more than three months after his tax return would have been initially due if he were not on extension, Debtor's tax return for the most

---

[17] *See* 11 U.S.C. § 521(m) which presumes that reaffirmation of a debt would constitute an undue hardship "if the debtor's monthly income less the debtor's monthly expenses...is less than the scheduled payments on the reaffirmed debt." This provision was adopted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.
[18] *See Traversa v. Educ. Credit Mgmt. Corp. (In re Traversa)*, 444 Fed. Appx. 472 (2d Cir. 2011).

12

current year had not been filed and is, therefore, not before the court. Notwithstanding that Debtor stipulated to his net income and the gross income of his girlfriend, given the inadequacy of Debtor's records, the court is unable to determine on the present record whether there is an excess in Debtor's expenditures that could properly be directed to repaying his student loans while maintaining for himself a minimal standard of living.[19] It is the Debtor's position that his ability to be considered under an income based repayment program or income contingent repayment program, though perhaps considered under Brunner's third prong, should not be properly considered under the first prong of the Brunner test, because these programs offer Debtor the opportunity to pay over a term of years and then have the debts deemed "satisfied" as distinct from constituting "repayment" of the debt, which is the term specifically employed in § 523(a)(8).[20] This argument cannot be advanced as to Access as its proposal to the Debtor, after proposing to reduce the principal by ten per cent and eliminate interest, provided for repayment of the debt over a term of years. As to U.S. Dep't. Educ., the Debtor eliminated himself from the Program and did not reapply, and the specific details of an alternative program for which the Debtor now qualifies is not before the court. Courts have differed on their resolution of this issue, but it need not be decided on the present record since the court finds that the Debtor has not otherwise met his burden in establishing the first prong.

> *Second Prong: Do additional circumstances exist to indicate that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans?*

The court answers this question in the negative. Given that the Debtor has failed to establish the first prong, there is no basis to conclude what the state of affairs is to then infer that

---

[19] On the other hand, from the records that the Debtor did produce, the Debtor's First Niagara account did reflect an excessive amount of expenditures, discussed *supra*, resulting in a cash flow out the door that could have been applied in payment of Debtor's student loans.

[20] Debtor makes the further point that these programs at the end of the period of payment result in forgiveness of debt income with substantial tax consequences to the debtor.

13

it is likely to persist for a significant portion of the repayment period. It has been held that a debtor's "austere budget, financial difficulty and inadequate present employment are not grounds for discharging educational debts under Code § 523(a)(8)." *In re Wells*, 380 B.R. 652, 660 (Bankr. N.D.N.Y. 2007).

Additional circumstances involve, among other factors, an examination into whether the debtor has maximized his income potential, has more lucrative job skills, has a limited number of years in his work life remaining, and whether the debtor's age or other factors prevent retraining or relocation. *Nys v. Educ. Credit Mgmt. Corp. (In re Nys)*, 308 B.R. 436, 446-67 (9th Cir. B.A.P. 2004). The Debtor is only 31 years of age, has no health impairment to preclude his ability to work and no dependents. Although he has "settled" into a consumer bankruptcy practice—at a time when the market for bankruptcy filings has declined— he is not limited to that area of the law. There are many other areas that he could diligently pursue and, with appropriate application and study, expand his horizons and competence to engage in more lucrative areas of practice. He is also not restricted to the geographical area in which he finds himself. In interpreting the second prong of its own *Brunner* test, the Second Circuit has commented, "[i]n *Brunner*, we found that the second prong was not satisfied where the debtor was not disabled or elderly, had no dependents, and "[n]o evidence was presented indicating a total foreclosure of job prospects in her area of training." *In re Traversa*, 444 Fed. Appx. at 474-75 (citing to *Brunner*, 831 F.2d at 396-97). From the evidence presented, the court does not believe that the Debtor is totally foreclosed from obtaining other legal work.

*Prong Three: Has the Debtor made good faith efforts to repay the loans?*

Even had the Debtor successfully satisfied prongs one and two of the *Brunner* test, the court finds that he has not made a good faith effort to repay the loans to Access and the U.S.

14

Dep't. Educ. The court finds that the Debtor's application to the U.S. Dep't. Educ. was not as forthright as it could have been when applying for both consolidation of his loans and acceptance into the IBRP. It is questionable whether Debtor accurately represented his stated income for 2010, in light of his testimony that he was terminated from the law firm on November 3, and acknowledged having received income from one or more private clients in December, 2010.

Despite his acceptance into the IBRP, Debtor's ongoing personal expenditures, including his purchase of a luxury automobile, reveal a callous disregard to put the repayment of his student obligations in proper perspective and priority. His bank records reflect personal expenses for the six months of January through March, 2011 and September through November, 2011 of $10,600—$2,732 of which are for dining out. The fact that statements are missing for the months of April through August and December of 2011 suggest that these totals would be much higher if the Debtor had made all of his records available. The court is also left with serious questions as to why, after having been accepted into the IBRP, the Debtor never submitted his tax return to verify his income so that he could remain in the Program. His explanation that he didn't have the $450 to pay his accountant to prepare the return is just not plausible. At best, and more believable is his proffered explanation that it just was not a high priority. In the court's opinion, regardless of how busy he was with his law practice, this statement belies the Debtor's good faith efforts to repay the very student loan obligations, which enabled the Debtor to secure his Juris Doctor degree and open his own law practice in the first instance. At worst, the court is left to question whether the real underlying explanation for Debtor's failure to submit his tax return was that a 2010 tax return might reflect income that Debtor had not disclosed in his initial application to the government.

Following the filing of bankruptcy, despite Debtor's discharge of approximately $144,000 in unsecured debt, the Debtor still did not direct excess cash flow toward paying down his student loans. Instead, from February, 2013 through March of 2014, the plaintiff charged and incurred various personal expenses that include numerous video game expenses and international transaction fees that amount to approximately $1,918.00. As noted previously, there is also a significant understatement by the Debtor regarding the "$500" budgeted amount that he estimated that he was paying monthly on his girlfriend's credit cards. When the monthly average that the Debtor actually paid is upwards to six times that amount and no statements are produced by the Debtor to document what those expenditures were for, the court is left with little basis to conclude that no excess cash flow was available to make payments on the Debtor's outstanding loan obligations and that the Debtor made good faith efforts to repay his student loans.

*Conclusion*

The Debtor has failed to establish by a preponderance of the evidence that he meets the Second Circuit's three-prong *Brunner* test to find that repayment of his student loan obligations would impose an undue hardship. Accordingly, a separate judgment shall issue dismissing the complaint as to Access and U.S. Dep't. Educ.

Dated: December 18, 2014        Margaret Cangilos-Ruiz
Syracuse, New York        United States Bankruptcy Judge

16